UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO.: 8:23-cr-00025-VMC-AEP

AMBER SMITH-STEWART
_____/

**DEFENDANT SMITH-STEWART'S MOTION TO DISMISS ALL COUNTS**

On the authority of Fed. R. Crim. P. 12(b)(3)(B)(v), Defendant Amber Smith-Stewart moves to dismiss all counts in the superseding indictment, because they fail to state an offense. None of the facilities named in the indictment are properly alleged to provide "reproductive health services" pursuant to 18 U.S.C § 248(e)(5) (the Freedom of Access to Clinic Entrances ("FACE") Act) and *Raney v. Aware Woman Center for Choice, Inc.* 224 F.3d 1266, 1268-69 (11th Cir. 2000), *cert. denied*, 532 U.S. 971, 121 S. Ct. 1602 (2001). As such, the indictment fails to state an offense under the FACE Act and should be dismissed.

Defendants are charged in a three-count superseding indictment. (Doc. 54).

In Count 1, the Government alleges the Defendants violated 18 U.S.C. § 241 by spray-painting three facilities, Facilities A, B, and C. The Government alleges 18 U.S.C. § 241 was violated because, pursuant to 18 U.S.C § 248, facilities A, B, and C are "reproductive health facilities." The Government notes that each location

1

provides "free pregnancy counselling, pregnancy testing, and ultrasound examinations." However, the indictment does not allege that the facilities are licensed, credentialed, or operated by trained professionals, as required by the binding precedent in *Raney*. *See* Doc. 54 at 3-4; *Raney,* 224 F.3d at 1269.

Count 2 alleges that Defendants violated 18 U.S.C § 248(a)(1)(2) (part of the FACE Act), using threat of force "because the employees were providing and seeking to provide reproductive health services." (Doc. 54 at 4). Count 3 alleges that Defendants violated 18 U.S.C § 248(a)(3)(2) (another part of the FACE Act), by intentionally damaging each facility "because the facility provides reproductive health services." (Doc. 54 at 5). Neither Count 2 nor Count 3 further allege anything regarding each facility's status as a "reproductive health service" provider.

Each facility allegedly provides "abortion alternatives." (Doc. 54 at 2.) Such facilities are otherwise known as crisis pregnancy centers (CPCs). CPCs, in general, are non-profit organizations that are often Christian-affiliated and assert that they provide pregnancy testing and "counseling," but seek to intercept people looking for abortions.[1]

---

[1] https://www.care-net.org/what-is-a-pregnancy-center, https://www.care-net.org/about, https://www.heartbeatinternational.org/about-us ("Heartbeat affiliates shall not advise, provide, or refer for abortion, abortifacients, or contraceptives . . . . Heartbeat affiliates encourage chastity as a positive lifestyle choice.") The Court may take judicial notice of such facts pursuant to FRE 201.

Defendant Smith-Stewart submits that the question of what must be alleged for a *prima facie* claim of a FACE Act violation involves a question of law as to the interpretation of the phrase "reproductive health services facility." Otherwise, as with the *Raney* plaintiff's rejected attempts, the courts would risk being inundated with FACE Act claims by "unregulated volunteer counselors who are not attached to recognized providers of reproductive healthcare." *Raney*, 224 F.3d at 1269. As the Eleventh Circuit noted in *Raney*, "Congress recognized the difference between trained professionals who work in credentialed facilities" and such unregulated counselors. *Id*.

Although not on the face of the superseding indictment, the Court here may take judicial notice of undisputed historical and political facts, as well as of government reports, statutes, and public records. FRE 201(b); *Wilding v. DNC Services Corp.*, 941 F.3d 1116, 1123 (11th Cir. 2019) (taking judicial notice of Bernie Sander's endorsement of Hilary Clinton for president of the United States); *Patel v. United States Att'y Gen.*, 971 F.3d 1258, 1264 n. 3 (11th Cir. 2020), *aff'd sub nom. Patel v. Garland*, 142 S. Ct. 1614 (2022) ("Federal courts, however, must take judicial notice of state law) (quoting *Lamar v. Micou*, 114 U.S. 218, 223, 5 S. Ct. 857, 859 (1885) ("The law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof."); *Terrebonne v.*

*Blackburn*, 646 F.2d 997, 1000 n. 4 (5th Cir. 1981) (*en banc*) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports").[2]

The FACE Act was a legislative response to the targeting of abortion clinics and doctors in the 1970's and early 1980's by anti-abortion groups. By 1991, researchers had chronicled 110 incidents of arson, firebombing, or bombing of abortion providers between 1977 and 1988. Grimes DA, Forrest JD, Kirkman AL, Radford B., "An epidemic of antiabortion violence in the United States," Am J Obstet Gynecol. 1991 Nov; 165 (5 Pt 1):1263-68.[3] During the same period, researchers also recorded additional attacks on abortion providers -- 222 clinic invasions, 220 acts of clinic vandalism, 216 bomb threats, 65 death threats, 46 assaults/batteries, 20 burglaries, and 2 kidnappings. *Id*. In response to this epidemic of anti-abortion violence targeting both clinics and providers, the Freedom of Access to Clinic Entrances (FACE) Act was signed into law in May 1994.

Despite the passage of the FACE Act, violent attacks against abortion providers and clinics continued. In 2022, The United States Department of Justice

---

[2] *See Bonner v. City of Prichard, Ala*., 661 F.2d 1206, 1207 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

[3] Available at https://www.ajog.org/article/S0002-9378(12)90739-5/pdf

prosecuted at least 26 anti-abortion individuals of FACE Act criminal offenses.[4] Physicians and staffers at reproductive health clinics providing abortions continue to risk their lives. Last year alone, violence and threats against abortion clinics increased in every category: arson, invasion, bioterrorism threats, death threats, burglary, stalking, and bomb threats.[5]

MEMORANDUM OF LAW -- FAILURE TO STATE AN OFFENSE

Mx. Smith-Stewart moves to dismiss all counts in the indictment because the Government fails to allege the facilities at issue in this case provide credentialed and licensed "reproductive health services."[6] Unfortunately, "reproductive health services" is not clearly defined in the FACE Act, because the statutory definition is tautological -- "Reproductive health services" are defined as "reproductive health services." 8 U.S.C. § 248(e)(5). However, what is clear is that such "services" are covered by the FACE Act only if they are:

> provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the

---

[4] United States Department of Justice, *Recent Cases on Violence Against Reproductive Health Care Providers*, (last visited May 30, 2023), https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers.

[5] *2022 Violence and Disruption Statistics*, National Abortion Federation, (last visited May 30, 2023), https://prochoice.org/wp-content/uploads/2022-VD-Report-FINAL.pdf.

[6] Mx. is the gender-neutral and preferred honorific for Amber Smith-Stewart. For more information on this topic and use of this honorific, see District of Oregon United States Magistrate Judge Mustafa T. Kasubhai's October 13, 2022, white paper on Pronouns in the Courts. https://ord.uscourts.gov/index.php/component/rsfiles/download-file/files?path=judges%252FKasubhai%252FPronouns%2Bin%2Bthe%2BCourts.pdf&Itemid=1581

human reproductive system, including services relating to pregnancy or the termination of a pregnancy. 18 U.S.C. § 248(e)(5).

As noted *supra*, the Eleventh Circuit has, fortunately, interpreted this confusing definition ruling in *Raney* that the FACE Act cannot be used to protect or vindicate the rights of unregulated entities or people who do not provide credentialed medical care serving patient's reproductive health needs. 224 F.3d at 1268-69. In *Raney*, the plaintiff, who provided anti-abortion-related religious counseling to pregnant women outside of a medical facility, could not state a cause of action under FACE, because his work was not done within a reproductive health services facility -- even though he undisputedly provided pregnancy-related counseling. *Id*. Further, the Court focused on the meaning of "reproductive health services" provided by Congress:

> By requiring that the person bringing a FACE action be seeking or providing reproductive health services in a facility, Congress recognized the difference between trained professionals who work in credentialed facilities and unregulated volunteer counselors who are not attached to recognized providers of reproductive healthcare.

*Raney,* 224 F.3d at 1269.

Because of the unregulated and uncredentialed status of the civil plaintiff in the *Raney* case, the Eleventh Circuit held that he could not state a cause of action under the FACE Act, and that therefore the district court did not abuse its discretion in denying Raney's motions. *Id.* at 1269.

6

Although *Raney* was a civil case, the civil and criminal sections of the FACE statute share a single definitions section. Therefore, "[w]hile most of the cases interpreting FACE have involved criminal sanctions, there is no indication in the statute that the elements of the prohibited activity are to be interpreted any differently when imposing civil as opposed to criminal sanctions." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 681 (11th Cir. 2001) (internal quotations and citations omitted).

In *Roe v. Aware*, the Eleventh Circuit held that a civil plaintiff properly alleged she had sought "reproductive health services" under the FACE Act when she alleged:

> . . . while undergoing the abortion procedure Roe told Dr. Egherman's assistants that she was experiencing "extreme, excessive pain in her abdomen." She "begged the abortionist to stop" and "demanded that an ambulance be called to take her to the emergency room at the local hospital." However, "[i]nstead of calling an ambulance, defendants' staff forcibly held [Roe] on the table" thereby "preventing her escape from the facility." As a result of those acts of the defendants, Roe alleges that she "suffered a perforated uterus" which required several days of hospitalization.

*Id.* at 681-82. The Court reasoned that the services Roe sought and was denied -- repairing damage done to her uterus, saving her pregnancy, or completing the abortion at a hospital -- all constituted reproductive health services under the FACE Act. *Id.* at 682. Notably, unlike the instant case and *Raney*, all of these procedures are medical in nature, and were properly pled with sufficient detail on the face of the complaint for the Court to make that assessment.

The Eleventh Circuit's holdings in *Raney* and *Roe* regarding how to interpret the phrase "reproductive health services" are both binding and eminently reasonable. When a word in a statute is not defined within that statute, courts "normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). *See also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982) (Court's task is to "give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'") (internal citations omitted).

To determine the ordinary or natural meaning of words, courts look to sources such as dictionaries and treatises for common usage. *See, e.g., Smith*, 508 U.S. at 228 (to determine the ordinary meaning of the word "use," the Supreme Court looked to both Webster's New International Dictionary and Black's Law Dictionary, as well as past judicial interpretations).

Commonly used dictionaries define "health care" and "health services." Merriam Webster presents the layperson's definition of "health care" as "efforts to maintain or restore physical, mental, or emotional well-being *by trained and licensed professionals.*"[7] (Emph. added). The medical definition from Merriam Webster is essentially the same: "the maintaining and restoration of health by the

---

[7] Merriam-Webster.com Dictionary, s.v. "health care," accessed May 30, 2023, https://www.merriam-webster.com/dictionary/health%20care.

treatment and prevention of disease especially *by trained and licensed professionals* (as in medicine, dentistry, clinical psychology, and public health)."[8] (Emph. added).

The term "health care services" is similarly defined in another federal statute -- the Public Health and Safety Act of 1944 -- as "any services p*rovided by a health care professional, or by any individual working under the supervision of a health care professional*, that relate to . . . the diagnosis, prevention, or treatment of any human disease or impairment; or . . . assessment or care of the health of human beings." 42 U.S.C. § 234(d)(2) (emph. added).

In the instant criminal prosecution, the Government's indictment must allege the elements of each count. Because one of the elements in each of the counts – "reproductive health services" -- is a term of art subject to the above-referenced "plain language" statutory interpretation, Defendant Smith-Stewart submits that the indictment must include an allegation that the facilities allegedly affected by Defendants were staffed by trained healthcare professionals working in credentialed facilities that provide healthcare -- as that term is commonly, medically, and legally understood.

This Court "may resolve a motion to dismiss in a criminal case when the 'infirmity' in the indictment is a matter of law and not one of the relevant facts is

---

[8] *Id.*

9

disputed." *United States v. Zayas-Morales,* 685 F.2d 1272, 1273 (11th Cir. 1982). And while "it is generally enough for an indictment to track statutory language, . . . simply tracking statutory language does not suffice when the resulting indictment fails to fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offen[s]e intended to be punished." *United States v. Johnson,* 981 F.3d 1171, 1179-80 (11th Cir. 2020) (citation and internal quotation marks omitted). Without clear and proper averments as to this critical element, the Government has failed to state federal offenses, and at most, the allegations involve state law crimes of criminal mischief.

The indictment alleges that the following services are offered by Facilities A, B, and C: free pregnancy counseling, pregnancy testing, and ultrasound examinations. (Doc. 54 at 3 and 4). But those alleged services do not require healthcare credentials or licensure in the State of Florida, as discussed *infra*.

First, the Court can and should take judicial notice that anyone can obtain an over-the-counter urine pregnancy test without a prescription, and therefore that type of test does not fit within the plain language definition of "health care services," as discussed *supra*. *See, e.g.*, *Hernandez v. Crespo*, 211 So. 3d 19, 24 (Fla. 2016) (discussing over-the-counter pregnancy tests); *see Samanski v. Mobile Seafood Co.*, 258 F.2d 823, 825 (5th Cir. 1958) (taking judicial notice of the "infectious character of pulmonary tuberculosis"); *Shahar v. Bowers*, 120 F.3d 211,

214 (11th Cir. 1997) (courts can take notice of facts that are "not subject to reasonable dispute in that it is . . . generally known within the territorial jurisdiction of the trial court.")

Second, ultrasound technicians are not required to be licensed in Florida.[9] Although entities like the American Registry for Diagnostic Medical Sonography (ARDMS) administer exams and award credentials to ultrasound technicians,[10] technicians are not required to obtain such credentials.[11]

Lastly, in regards to free pregnancy counseling offered by these "clinics," while Florida does generally require counselors to be licensed and credentialed, including family counselors (*see* Fla. Stat. Ann. chapter 491 generally), there are licensing exceptions for employees of non-profits providing *free* family counseling, and for religious counseling. Fla. Stat. Ann. §§ 491.014(3) and (4)(b). Here, as alleged in the superseding indictment, each Facility offers all services, including "counseling," free of charge. (Doc. 54, 3 and 4).

Urine pregnancy tests, ultrasounds, and pregnancy counseling are not healthcare, under the plain language definitions discussed *supra*, because they are not provided *by trained and licensed professionals*.

---

[9] https://www.floridahealth.gov/licensing-and-regulation/radiologic-technology/help-center/index.html, FAQ #2; https://www.sdms.org/advocacy/state-licensure.

[10] https://www.ardms.org/discover-ardms/about-ardms/.

[11] https://www.ardms.org/scope-of-practice/.

In the past, the FACE Act has been applied to protect non-licensed, or non-credentialed employees or workers associated with abortion clinics. However, the courts have found that the uncredentialed worker was assisting a credentialed professional, such as a doctor or nurse, in their provision of reproductive medical care. *See, e.g.*, *United States v. Hill*, 893 F. Supp. 1034, 1039 (N.D. Fla. 1994) (abortion clinic escort was within FACE Act, because they were integral part of function to provide medical services to patients by credentialed provider); *U.S. v. Dinwiddie*, 76 F.3d 913, 926-27 (8th Cir. 1996) (because maintenance supervisor's position was essential to ability of the facility's doctor to perform a medical procedure – abortion – maintenance worker was a "provider" under FACE Act.). Unlike the lay counseling and other unlicensed services provided by the "clinics" that are the subject of this indictment, abortions are clearly reproductive health care, as they can only be carried out by credentialed, licensed medical providers.[12]

Therefore, on the face of the indictment, the Government has failed to sufficiently allege the necessary element of *credentialed* "reproductive health care services" protected by the FACE Act. If a facility or provider is not licensed or credentialed, and is not operated by trained healthcare professionals, it does not provide "reproductive health services" under the plain language of the FACE Act.

---

[12] *See* Fla. Stat. §§ 390.012, 390.014(1), 390.0111, 408.802(2), (3), (8), (10); Fla. Admin. Code R. 59C-1.022(1)-(1a); https://ahca.myflorida.com/health-care-policy-and-oversight/bureau-of-health-facility-regulation/hospital-outpatient-services-unit.

Without the requirement that a facility or providers be so credentialed and/or licensed, any unlicensed, uncredentialed, person or nonprofit entity that claimed they were a reproductive health service provider could assert FACE Act protections, in total disregard for the intent and plain language of the statute. As such, the Government has failed to state an offense.

The Government has not alleged, and cannot allege, that Facilities A, B, and C are providers of "reproductive health services," and as such the indictment must be dismissed.

Respectfully submitted,

/s/ *Lauren C. Regan*
Lauren C. Regan, OSB # 970878
Civil Liberties Defense Center
1711 Willamette Street, Ste. 301 #359
Eugene, OR 97401-9049
Telephone: (541) 687-9180
Fax: (541) 804-7391
Email: lregan@cldc.org


/s/ *Sarah Alvarez*
Sarah Alvarez, OSB # 182999
Civil Liberties Defense Center
1711 Willamette Street, Ste. 301 #359
Eugene, OR 97401-9049
Telephone: (541) 687-9180
Fax: (541) 804-7391
Email: salvarez@cldc.org

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this **July 14, 2023** I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.

/s/*Sarah Alvarez*
Sarah Alvarez, Esquire